# FEDERAL DEFENDER SERVICES OF WISCONSIN, INC.

LEGAL COUNSEL

Craig W. Albee, Federal Defender
Krista A. Halla-Valdes, First Assistant

Guy Cardamone, Madison Supervisor
John W. Campion
Alexandra Douglas
Ramuel R. Figueroa
Matthew Giesfeldt
Jonathan Greenberg
Gabriela A. Leija
Julie K. Linnen
Dennise Moreno
Tom Phillip
Joshua D. Uller
Alex Vlisides

411 East Wisconsin Avenue
Suite 2310
Milwaukee, Wisconsin 53202

Telephone 414-221-9900
Facsimile 414-221-9901

August 19, 2025

Honorable Brett H. Ludwig
United States District Court
517 East Wisconsin Avenue
Milwaukee, WI 53202

Re: *United States v. Nygil McDaniel*
Case No. 22-cr-176

Dear Judge Ludwig:

More than three years ago, in March 2022, Nygil McDaniel had his girlfriend purchase a firearm on his behalf. Mr. McDaniel was not a felon – his first and only felony conviction, in fact, comes from this very case. But Mr. McDaniel did have a pending criminal case – child neglect charges for leaving his two sleeping daughters home alone to go to the local grocery store. The conditions of his signature bond in that case did not prohibit Mr. McDaniel from possessing a firearm. *See* Wisconsin Circuit Court Access, Racine County Case No. 2021CF1653, Order Setting Signature Bond (Jan. 13, 2022) (listing the following bond conditions: "No violent contact with children. Make all court appearances on time"). And the case ultimately resulted in a misdemeanor conviction that similarly did not bar Mr. McDaniel from purchasing or possessing a firearm. Nevertheless, the charges and his poor decisions that lead to them were a source of embarrassment for Mr. McDaniel, and it was not a situation he wanted to have to explain when purchasing a firearm. So, Mr. McDaniel made another bad decision: he asked his girlfriend, Jessica O'Hora, to purchase a firearm for him.

August 19, 2025
Page 2

It is a decision that Mr. McDaniel regrets deeply. He not only uprooted his own life, but he also selfishly put his partner, Jessica O'Hora, who had never been in trouble with the law, in the crosshairs of the criminal justice system. Mr. McDaniel has accepted full responsibility for that conduct by pleading guilty to aiding and abetting Ms. O'Hora's straw purchase of a firearm in March 2022.

This Court must now decide what sentence is sufficient, but not greater than necessary, to achieve the goals of sentencing for that straw purchase. For her part in this offense, Ms. O'Hora received a sentence of probation. For his part, Mr. McDaniel has already served 17 months in federal pretrial custody– the longest criminal sentence he has ever faced. He has also pleaded guilty to his first felony, giving him the lifelong status of a felon and prohibiting him from ever possessing a firearm in the future. That is significant – and sufficient – retribution. Indeed, 17 months is above Mr. McDaniel's recommended sentencing range under the guidelines when calculated correctly to include only conduct relevant to his offense and excluding dated, unrelated conduct, for which Mr. McDaniel has already faced punishment in state court.

For those reasons, Mr. McDaniel respectfully asks the Court to sentence him to time served, crediting him for the 17 months he has already spent in pretrial custody, to be followed by a term of supervised release. Mr. McDaniel submits the following letter in support of his request.

## BACKGROUND

*Mr. McDaniel grew up surrounded by violence in an environment that normalized firearms*

Like many defendants who come before this Court, Mr. McDaniel did not have an easy childhood. His father, Avery McDaniel, struggled with paranoid schizophrenia. Although Avery sought and received mental health treatment, it was never quite enough to truly stabilize him. Avery could never keep a job, and he did not have a stable home. Finding little reprieve from the worst of his mental health symptoms, Avery eventually turned to drugs and alcohol to cope.

For much of his early life, Mr. McDaniel's mother, Sharmeen Hale, tried to shield her son from the worst of his father's struggles. Sharmeen and Avery separated when Mr. McDaniel was just four years old. The couple shared three children at the time – Mr.

August 19, 2025
Page 3

McDaniel was the oldest at four, followed by his siter Nina who was two, and their younger brother Nelson, who was only a few months old. The separation was difficult but necessary. Avery's drug and alcohol use were getting worse, and Sharmeen wanted to protect her children. But that meant Sharmeen had to shoulder the heavy burden of providing for the three young children on her own.

Sharmeen did her best, working long hours in demanding healthcare jobs to keep the young family afloat. But the family struggled financially. For most of his life, Mr. McDaniel lived in poor urban neighborhoods. Sharmeen tried to shield her children from the worst parts of their environment, but crime, violence, and firearm-related violence specifically, were ubiquitous. Despite his mother's best efforts to protect her children, Mr. McDaniel witnessed a fatal shooting before he had even lost the last of his baby teeth. He was just ten years old.

That early, constant, exposure to firearm-related violence had a lasting impact on Mr. McDaniel. A growing body of research shows that "youth exposed to violence are significantly more likely to carry guns as a means of self-protection and to cope with the heightened sense of threat in their environment." *See* Samantha Kopf & Mitchell Gresham, *Neighborhoods, Violence, and Guns: Unraveling the Drivers of Youth Gun Carrying in Adjudicated Populations*, Journal of Criminal Justice 98: 102417 (June 2025); *see also* Rebeccah Sokol, et al., *The Association Between Perceived Community Violence, Police Bias, Race, and Firearm Carriage Among Urban Adolescents and Young Adults*, Prev. Med. 154:106897 (Jan. 2022) (finding that "an individual is more likely to carry a firearm if they perceive greater levels of community violence, and this association is stronger if the individual does not trust the police to protect them against such violence"). For people who grow up surrounded by such persistent and pervasive gun violence in their communities, "feelings of fear, a general sense of being in danger, and paranoia" are the norm. *See* David Seal et al., *Youth Exposure to Violence in an Urban Setting*, Urban Studies Research 368047 (Nov. 2014). They can become accustomed to the violence, "accept[ing] it as a normal part of life" and normalize the need to carry a firearm themselves as a form of "self-protection." *Id.*  And that is exactly what Mr. McDaniel's early childhood exposure to community violence did; it garnered a sense that carrying a firearm for self-protection was not just normal, but a rational response to the violence that surrounded him.

August 19, 2025
Page 4

*Despite his difficult childhood environment, Mr. McDaniel's criminal history is relatively limited.*

While Mr. McDaniel's childhood experience growing up in a poor, high-crime neighborhood mirrors the background of many defendants who come before this Court, Mr. McDaniel does stand apart in one important way. Despite growing up in such an environment surrounded by crime, violence, and negative influences, Mr. McDaniel's criminal history is relatively limited.

At 31 years old, Mr. McDaniel has no prior felony convictions, this case is his first. He has no history of firearm-related violence – no armed robberies, no carjackings, no reckless endangerment. Nor has Mr. McDaniel ever been convicted or even accused of using a firearm to threaten any other person, nor doing anything more with a firearm than carrying it without the appropriate concealed carry permit.

*Underlying Offense*

Mr. McDaniel has pleaded guilty to aiding and abetting his then-girlfriend, Ms. O'Hora in straw purchasing a firearm for him more than three years ago, in March 2022. Importantly, Mr. McDaniel was not a felon at the time. While Mr. McDaniel did have pending criminal charges for stepping out to the grocery store while his two daughters were asleep in his apartment, this Court has already found that those charges could not constitutionally prohibit Mr. McDaniel from lawfully possessing a firearm. *See* ECF No. 84.

The government maintains that Mr. McDaniel was nevertheless prohibited from possessing a firearm at the time because he was an "unlawful user of a controlled substance," specifically marijuana. To support that argument, the government largely relies on Mr. McDaniel's own admission to ATF agents in 2020 that he regularly smoked marijuana at the time. But that admission from two years before is simply not enough for the government to prove Mr. McDaniel was a prohibited person *at the time* of his March 2022 offense.

The Seventh Circuit has repeatedly found that in order to be an "unlawful user of a controlled substance" within the meaning of § 922(g)(3), a person's drug use must be *both* "habitual" and "contemporaneous with the gun possession." *See United States v. Yancey*, 621 F.3d 681, 687 (7th Cir. 2010) (emphasis added); *see also United States v. Cook*, 970 F.3d

August 19, 2025
Page 5

866, 883 (7th Cir. 2020) (a finding that someone is an "unlawful user" requires that their drug use be "both regular and ongoing at the time that the defendant possessed a gun" (emphasis added)). These additional standards are particular and demanding, and with good reason: "courts generally agree the law runs the risk of being unconstitutionally vague without [the] judicially-created temporal nexus between the gun possession and *regular* drug use." *United States v. Turnbull*, 349 F.3d 558, 561 (8th Cir. 2003) (emphasis added).

Here, the government has provided virtually no evidence that Mr. McDaniel was using marijuana with sufficient regularity to make him an "unlawful user" within the meaning of the statute at the time of his offense in 2022. The fact that Mr. McDaniel admitted to regularly smoking marijuana nearly two years before, when he was questioned by ATF agents in 2020, is simply not enough to meet that burden because it says nothing of Mr. McDaniel's marijuana habits in 2022. *See United States v. Sperling*, 400 F. App'x 765, 768 (4th Cir. 2010) (unpublished) (defendant's statement that he had "used both marijuana and cocaine within a couple months of his arrest" and that he "continued to use them on and off" was insufficient to support conviction for possession of a firearm as an unlawful user); *United States v. Doughty*, No. 2:09-CR-62-WKW, 2009 WL 2132701, at *3 (M.D. Ala. July 14, 2009) (defendant's statement that he smoked marijuana for his back and a pipe containing detectable amount of marijuana found in his car insufficient to show defendant's drug use was regular, ongoing, and contemporaneous with firearm possession).

The government responds by pointing to three text messages from March 2022 between Mr. McDaniel and his girlfriend at the time that reference marijuana. But even taking them at face value, three messages are not enough to establish that Mr. McDaniel was engaging in "regular" or "habitual" marijuana use at the time of his offense. As the Seventh Circuit has explained, "a single or occasional, irregular use of a controlled substance," is not enough to meet the standard of "regular" or "habitual" use required under for § 922(g)(3). *Cook*, 970 F.3d at 879.

The problem is only more pronounced when the messages are put into broader context. First, none of the messages actually show that Mr. McDaniel actually smoked marijuana on any of those dates. In fact, there's evidence to the contrary. On March 9, 2022, for example, the messages immediately following the ones highlighted by the government indicate that Mr. McDaniel and Ms. O'Hora got into an argument and did not follow through on their purported plans to meet up to smoke:

> **McDaniel:** And if you're not coming soon lmk cause imma go somewhere.
>
> **O'Hora:** Damn? Okay well you wanna go somewhere else do it. Tf.
> How you gonna ask me to come by you but then tell me you made plans to go be with someone else
>
> **McDaniel:** You said you were leaving where you were over an hour ago. I don't like waiting
>
> **O'Hora:** Ok well sorry my grandpa came over.
> Do you boo
>
> **McDaniel:** Ok.
>
> **O'Hora:** Yep
> You're shitty
> As fuck. But we'll see how it goes from here
>
> **McDaniel:** Ok
>
> **O'Hora:** Have fun with your hoe. Hope it's worth it.

Similarly, the messages from the following day on March 10, 2022, again suggest Mr. McDaniel did not smoke marijuana on that day, either. In those messages, Ms. O'Hora tells Mr. McDaniel that she did not have any marijuana because she wasn't getting "paid till tomorrow." Ms. O'Hora also tells Mr. McDaniel he wouldn't want the marijuana her roommate, Tab, had purchased because it was "not the best." ECF No. 115 at 8. Those messages suggest Mr. McDaniel did not actually smoke marijuana on that date. The messages also suggest that, unlike many regular marijuana users, Mr. McDaniel did not readily have marijuana in his personal possession. Rather, in her messages, Ms. O'Hora appears to presume that Mr. McDaniel would not have marijuana of his own.

Those messages, therefore, are not enough for the government to meet its evidentiary burden of proving that Mr. McDaniel was a prohibited person at the time of the March 2022 offense. Of course, even if Mr. McDaniel was not a prohibited person at the time, it was still unlawful for Ms. O'Hora to list herself as the "actual buyer" of a firearm

August 19, 2025
Page 7

intended for Mr. McDaniel, and it was unlawful for Mr. McDaniel to aid and abet that conduct. *See Abramski v. United States*, 573 U.S. 169, 189 (2014) (finding that even though defendant's uncle could have legally purchased the firearm for himself, defendant's claim to be the "actual buyer" of the firearm intended for his uncle was a false statement under § 922(a)(6)). But it is worth reiterating that, ultimately, the offense this Court must sentence Mr. McDaniel for is aiding and abetting the straw purchase of a firearm for himself – a person who was not a felon, who there is no evidence was otherwise a prohibited person at the relevant time, and who has no history of firearm-related violence.

## SENTENCING GUIDELINES

Before turning to what sentence would be sufficient but not greater than necessary to meet the goals of sentencing here, it's worth taking a moment to parse out the federal sentencing guidelines. The Revised Presentence Report, ECF No. 114, significantly overshoots Mr. McDaniel's recommended sentencing range by adopting the government's overly broad approach to "relevant conduct" and crediting the government's unsupported claim that Mr. McDaniel was a "prohibited person" at the time of his offense.

Specifically, Mr. McDaniel's offense of conviction is aiding and abetting the March 2022 straw purchase. Because, as noted above, the government has not met its burden of proving Mr. McDaniel was a prohibited person at the time of *that* offense, his base offense level should be 12 under § 2K2.1(a)(7).

The PSR, however, sets Mr. McDaniel's base offense level a whooping 8 levels higher, at 20. ECF No. 114 at ¶ 39. To justify that massive increase, the PSR considers not only Mr. McDaniel's actual offense of conviction – the March 2022 straw purchase— but also his unrelated possession of a firearm during political protests in Kenosha five years ago, in 2020. Again, at the time, Mr. McDaniel was not a felon. Nor did authorities observe him using the firearm to threaten, intimidate, or enact violence. Instead, he was simply carrying the firearm, a day after Kyle Rittenhouse had shot and killed two unarmed protestors during a Black Lives Matter protest in Kenosha. When he was questioned, Mr. McDaniel told officers he was at the protests because he wanted to protect his community and "deter someone from making a mistake." A misguided decision, certainly, but one born of witnessing the violence and bloodshed in his community just the day before that the police had failed to prevent, rather than any criminality. Although Mr. McDaniel was

August 19, 2025
Page 8

stopped and questioned by ATF back in August 2020, he was not federally charged. He was charged in state court, however, with carrying a concealed weapon without a valid permit. ECF No. 114 at ¶ 55. His firearms were seized, and Mr. McDaniel was eventually issued a fine and an order forfeiting his firearms in February 2021.

The PSR includes the above circumstances from August 2020 as "relevant conduct," and uses that conduct to justify the 8-level increase in Mr. McDaniel's base offense level and an additional 2-level enhancement for the number of firearms involved in the offense. ECF No. 114 at ¶¶ 39, 40. But that is contrary to the guidelines in two independent ways.

> ***First, the August 2020 protest conduct is not sufficiently related to the offense of conviction to constitute "relevant conduct" within the meaning of the guidelines.***

The allegations from the Kenosha protests in August 2020 predate the offense of conviction here by nearly two years. Further, although both situations – the 2022 straw purchase and the 2020 protest – broadly involved firearms in some way, they are not part of the same or continuing offense. Rather, they are two discrete circumstances. Indeed, Mr. McDaniel's possession of the firearms at the Kenosha protest was completed in August 2020, when he was stopped and questioned by the police and the firearms were confiscated. Mr. McDaniel did not ever possess those firearms again. The straw purchase nearly two years later was wholly unrelated. The draft PSR nevertheless adopts the government's position that the Kenosha protest in 2020 may be considered "relevant conduct" to Mr. McDaniel's 2022 offense of conviction. But that position stretches "relevant conduct" far beyond its meaning under the sentencing guidelines.

The sentencing guidelines allow courts to consider *some* conduct beyond the offense of conviction when calculating the recommended sentencing range, called "relevant conduct." *See* USSG § 1B1.3. In a firearm case such as this one, "relevant conduct" includes behavior that is "part of the same course of conduct or common scheme or plan as the offense of conviction." USSG § 1B1.3(a)(2).

Crucially, the "relevant conduct" guideline is not limitless. The Seventh Circuit has cautioned that "the relevant conduct provision, interpreted in an overly broad manner, has the potential of being a course instrument capable of causing years of serious incidental criminality to ride in at sentencing on the coattails of a relatively minor conviction." *United States v. Ritsema*, 31 F.3d 559, 565-67 (7th Cir. 1994). And that's precisely what the government advocates for here. Mr. McDaniel has been convicted of

August 19, 2025
Page 9

participating in a 2022 straw purchase, that has little to do with his possession of wholly distinct firearms nearly two years before in 2020.

Ultimately, the government bears the burden of proving, by a preponderance of the evidence, that there is an actual and meaningful connection between the extraneous conduct and the offense of conviction. To satisfy its burden, the government must show a "strong relationship" between the offense of conviction and the additional conduct through "a significant similarity, regularity, and temporal proximity." *United States v. Brasher*, 105 F.4th 1002, 1007 (7th Cir. 2024). Those factors function on a "sliding scale." *Id.* That is, "[w]ithout temporal proximity, the government needs a stronger showing regarding the other course of conduct factors, such as a regularity or similarity of acts." *Id.* The government simply cannot meet that burden here.

First, there is no temporal proximity between the offense of conviction and the 2020 protest. The 2020 conduct ended in August 2020, when the firearms Mr. McDaniel had in his possession were confiscated by police. The later straw purchase underlying his conviction here took place nearly two years later, in March 2022. This "lengthy time interval . . . tends to indicate conduct that can easily be separated into 'discrete, identifiable units,' rather than behavior that is part of the same course of conduct or common scheme or plan." *United States v. Sykes*, 7 F.3d 1331, 1337 (7th Cir. 1993). Here, we know Mr. McDaniel's 2020 protest conduct and his 2022 straw purchase can be separated into distinct units of prosecution because they, in fact, *were*. Mr. McDaniel was prosecuted for the Kenosha protest conduct back in 2020 and received a fine for carrying a concealed weapon without a CCW permit. *See* Kenosha County Circuit Court, Case No. 20-CM-1036.

Further, the 19 months between Mr. McDaniel's possession of the firearms at the Kenosha protest and the 2022 straw purchase far exceeds the temporal bounds the Seventh Circuit has established for the relevant conduct inquiry. As the court explained in *Brasher*, where it considered a 15-month gap between the offense of conviction and the extraneous conduct:

> We agree with Brasher that temporal proximity is lacking here. Indeed, our precedent rules out the contrary conclusion. In one case, we held an eight-month gap was 'enough to cast doubt on the relevance of the earlier conduct.' *McGowan*, 478 F.3d at 802. The same goes for ten months. *See Ortiz*, 431 F.3d at 1041. Another case even cites out-of-circuit precedent

> labeling a five-month gap 'extremely weak' evidence of temporal proximity. *See United States v. Sykes*, 7 F.3d 1331, 1337 (7th Cir. 1993) . . . Drawing the line in this vicinity reflects a consensus, for several circuits have held temporal proximity absent – and hence more similarity required – when the gap between the two offenses runs past a year. *See United States v.* Garcia, 946 F.3d 1191, 1209 (10th Cir. 2020) (collecting cases).

*See Brasher*, 105 F.4th at 1007.

Without temporal proximity in its favor, the government's burdens on the other prongs – similarity and regularity – are even more demanding. But the government fails of both of those fronts, too.

Regarding, similarity: it is not enough that the 2020 conduct and the offense of conviction both involved firearms. Indeed, the Seventh Circuit has explicitly and repeatedly cautioned that "it is not enough that the extraneous conduct merely amounts to the same offense as the offense for which the defendant was convicted." *Sykes*, 7 F.3d at 1336 (quoting *United States v. Hahn*, 960 F.3d 903, 910 (9th Cir. 1992)). As the court has explained, § 1B1.3(a)(2) "must not be read" to simply and reflexively "encompass any offense that is similar in kind to the offense of conviction but that does not bear the required relationship to that offense." *United States v. Ortiz*, 431 F.3d 1035, 1040-41 (7th Cir. 2005) (quoting *United States v. Patel*, 131 F.3d 1195, 1204 (7th Cir. 1997)).

In *United States v. Purham*, 754 F.3d 411 (7th Cir. 2014), for example, the Seventh Circuit found that the government had not proven that two cocaine transactions were part of the "same course of conduct." Although both transactions "on some level" shared the common purpose of "[s]upplying cocaine to the residents of an individual city," that was too broad and generalized of a purpose to meaningfully link the transactions. *Id.* at 415.

The government grasps at the same level of broad abstraction here to try to tie Mr. McDaniel's August 2020 gun possession to the straw purchase nearly two years later, arguing that "both actions shared a fundamental 'common purpose' – i.e., the unlawful acquisition and possession of firearms." ECF No. 114 at 4. But that is *precisely* the level of generality that the Seventh Circuit rejected in *Purham* and that other circuit courts have similarly disavowed in the past. *See, e.g.*, *United States v. Bowens*, 938 F.3d 790, 799-800 (6th Cir. 2019) ("When we have upheld relevant-conduct determinations involving illegal

August 19, 2025
Page 11

gun possessions, we have emphasized characteristics about the possessions that show similarity *beyond* the act of unlawfully possessing a gun." (internal quotations omitted)).

The government relies on such a generalized "common purpose" here precisely *because* nothing else connects Mr. McDaniel's possession of firearms in 2020 and his participation in a straw purchase for a wholly distinct firearm in 2022. Indeed, the government hasn't even identified *any* real scheme or plan, let alone one that unifies the two otherwise discrete events. Moreover, while both circumstances involve firearms, they are different in kind. One involved the possession of concealed firearms without a valid permit. The other involves false statements to a federally licensed firearm dealer. The government cannot get around these fundamental differences by describing Mr. McDaniel's conduct "at such a level of generality as to eviscerate the evaluation of whether [they are] part of the same course of conduct or common scheme or plan." *Sykes*, 7 F.3d at 1337.

Nor can the government overcome the lack of temporal proximity and similarity with the final factor, regularity. The Seventh Circuit has defined "regularity" as "repeated acts or events that take place at fixed and certain intervals or in accordance with some consistent or periodical rule or practice." *Id.* (alterations omitted) (citing *Black's Law Dictionary* 1286 (6th ed. 1990)). Regularity "is relevant to the section 1B1.3(a)(2) inquiry because it indicates acts deriving from a common origin or plan." *Id.* As the Seventh Circuit has elaborated, "[r]epeated, regular acts or offenses occurring at fixed and certain intervals (*e.g.*, once a month or at a specific time each year) may suggest a plan linking the first offense to the last, whereas sporadic acts over an extended period of time generally do not permit the inference of a common scheme or plan but indicate independent acts that may lack the necessary link." *Id.* Here, the government has not identified any fixed or repeated acts that satisfy this showing or suggest a common scheme or plan. At best, the government has demonstrated sporadic instances of Mr. McDaniel involving firearms. The government, therefore, also fails to show any regularity, much less the significant regularity.

The PSR cites to *United States v. Beechler*, 68 F.4th 358, 370 (7th Cir. 2023) in support of finding that Mr. McDaniel's conduct from 2020 is "relevant conduct." ECF No.114 at ¶ 40. But the facts of *Beechler* actually underscore just how different Mr. McDaniel's case is from those in which the Seventh Circuit has found enough of a connection between offenses to apply the relevant conduct provision of the guidelines. In *Beechler*, the Seventh Circuit found "ample evidence to conclude that all the guns were part of the same course or common scheme or plan" because Beechler had possessed all the guns at the same

time, in the same home, with the very drugs that formed the basis of his offense of conviction. Further, Beechler himself had "admitted that he personally possessed the guns and acknowledged that the guns were at the home to protect the drugs." *Id.* That stands in stark contrast to what we have here – a gun possession that predates the offense of conviction by nearly two years.

> ***Second, the guidelines commentary requires the 2020 protest conduct to be considered as part of Mr. McDaniel's criminal history, not as relevant conduct.***

The second, independent, reason that the August 2020 protest conduct cannot be considered relevant conduct here is even more straightforward: Application Note 5(C) of § 1B1.3 of the guidelines clarifies that for the purposes of the relevant conduct provision in § 1B1.3(a)(2), "offense conduct associated with a sentence that was imposed prior to the acts or omissions constituting the instant federal offense (the offense of conviction) is *not* considered as part of the same course of conduct or common scheme or plan as the offense of conviction." Here, Mr. McDaniel's August 2020 conduct is "conduct associated with a sentence that was imposed prior" to his offense of conviction. Mr. McDaniel was sentenced on his state charges stemming from the August 2020 protest in February 2021. ECF No. 114 at ¶ 55. That predated his offense of conviction – the March 2022 straw purchase – by more than a year. Because Mr. McDaniel's August 2020 firearm possession was associated with a sentence that was imposed *before* the current offense began, it categorically cannot count as "relevant conduct," even if it did otherwise meet the definition of such conduct. *See* United States Sentencing Commission, *Primer on Relevant Conduct* (2022) at 16 ("If the defendant was sentenced for another offense before the events comprising the instant offense of conviction began, the conduct underlying the other offense is not considered as part of 'expanded relevant conduct' even if it otherwise would meet the subsection (a)(2) definition (*i.e.*, 'same course of conduct' or 'common scheme or plan').").

Instead, the August 2020 protest conduct should be considered as part of Mr. McDaniel's criminal history, accruing 1 point since it resulted only in a fine. *See* § 4A1.1(c).

> ***Conversely, Mr. McDaniel's March 2022 arrest and eventual conviction for possessing the very same straw-purchased firearm without a CCW permit is relevant conduct that should not count towards his criminal history score.***

The PSR assigns Mr. McDaniel 2 criminal history points for his March 2022 arrest and eventual conviction for carrying a concealed weapon. *See* ECF No. 114 ¶ 57. That conviction, however, involves Mr. McDaniel's possession of the very same Smith and Wesson 9mm pistol that Ms. O'Hora purchased for Mr. McDaniel just two weeks before. *Id.* ¶ 34. That conduct – possession of the very same firearm Ms. O'Hora straw purchased for him – is directly related to the offense of conviction. Those two offenses, in fact, directly share a specific common purpose: Mr. McDaniel's possession of that particular firearm. Accordingly, Mr. McDaniel's conviction for carrying that firearm without a CCW permit should be considered relevant conduct. As "relevant conduct," the offense cannot towards Mr. McDaniel's criminal history. *See* USSG § 4A1.2(a)(1) (defining "prior sentences" that count for criminal history points as "any sentence previously imposed upon adjudication of guilt . . . *for conduct not part of the instant offense*"); *see also* § 4A1.2(a)(1), Application Note 1 ("Conduct that is part of the instant offense means conduct that is relevant conduct to the instant offense under the provisions of §1B1.3 (Relevant Conduct).").

> *Mr. McDaniel's corrected guideline calculation*

Because the August 2020 conduct cannot be considered "relevant conduct," and the government has not met its burden of proving Mr. McDaniel was a prohibited person at the time of the March 2022 straw purchase, Mr. McDaniel's base offense level should be 12, not 20. Similarly, because the additional firearms from the August 2020 protest are not relevant conduct, they cannot be counted for purposes of the number of firearms enhancement under §2K2.1(b)(1). Accounting to the 2-level reduction for acceptance of responsibility, Mr. McDaniel's final offense level should, therefore, be 10.

Mr. McDaniel's criminal history category, on the other hand, would remain at III after the above correction because while his 2020 concealed carry violation should be counted in his criminal history instead of as relevant conduct, his 2022 concealed carry violation should be removed from his criminal history score because that is relevant conduct.

August 19, 2025
Page 14

At an offense level of 10 and a criminal history category of III, Mr. McDaniel's corrected guideline range is 10 to 16 months. That range reflects a more appropriate application of the guidelines' relevant conduct provisions that better comports with Seventh Circuit precedent and more accurately captures Mr. McDaniel's culpability.

## OTHER SENTENCING CONSIDERATIONS

With all of the above in mind, Mr. McDaniel respectfully requests that the Court impose a sentence of time served. Following his release from state custody, Mr. McDaniel was detained in this matter on March 20, 2024, and has remained in federal pretrial custody for the past 17 months. Mr. McDaniel also served an additional 80 days following his arrest for a related concealed carry violation involving the very firearm Ms. O'Hora straw purchased for him in March 2022. ECF No. 114 at ¶ 57. In total, Mr. McDaniel has, therefore, spent just under 20 months in custody for his purchase and possession of the Smith and Wesson pistol at the center of this case. Crucially, when considering the corrected calculation laid out above, that amounts to a 25% increase above the *top* of his guideline range. That amount of time is sufficient to meet the goals of sentencing here.

*Retribution*

Mr. McDaniel has already faced significant retribution for his conduct. Not only has Mr. McDaniel already served a sentence above the applicable guideline range, but he has done so in pretrial detention facilities. Such facilities have limited programming opportunities and conditions that are not meant to house people long-term. Dodge County Jail, where Mr. McDaniel is currently housed, for example, does not have any outdoor recreation area,[1] something courts have recognized as "extremely important to the psychological and physical well being of [ ] inmates." *Spain v. Procunier*, 600 F.2d 189, 199 (9th Cir. 1979). In many ways, then, custodial time in pretrial facilities can be more punitive than detention in their post-conviction counterparts.[2]

---

[1] *See* U.S. Department of Homeland Security, *Office of Detention Oversight Follow-Up Compliance Inspection for Dodge County Jail* (Aug. 2022) ("ODO observed no outdoor recreation area at DCJ but did note a large, windowless (no access to sunlight) recreation room with exercise equipment.").

[2] *See* Martin Schonteich, *Punishment Before Trial,* The Liman Report at 9 (2015) ("Pretrial detainees are generally confined in worse conditions than convicted prisoners. Pretrial detention centers tend to be especially overcrowded, and pretrial detainees typically have little or no access to educational, vocational, and related work opportunities.), Available at:

August 19, 2025
Page 15

And the difference is not just qualitative, it also has a quantifiable impact on Mr. McDaniel's sentence. While in pretrial custody, Mr. McDaniel could not participate in Bureau of Prisons programming to earn additional credit towards his sentence through the First Step Act, rendering the months he has already spent in pretrial custody more punitive than an equivalent post-conviction sentence would likely be.[3]

But that is not the only form of punishment and retribution that Mr. McDaniel has faced. Mr. McDaniel is now officially a felon, which brings an enormous amount of collateral consequences, from limitations on his voting rights, access to housing, employment prospects, and of course, a permanent bar on his Second Amendment rights. In fact, aa congressional report authored by the United States Government Accountability Office (GAO) identified 641 collateral consequences of a nonviolent felony conviction.[4] The felony status will impact Mr. McDaniel for the rest of his life, and that is also significant and meaningful retribution for his conduct here.

In addition to the time Mr. McDaniel has already spent in custody and the felon status he now possesses, Mr. McDaniel will also be subject to supervised released, which as the Supreme Court has recognized, is a significant infringement on liberty as well. *See, e.g.*, *Gall v. United States*, 552 U.S. 38, 48 (2007) (recognizing that offenders on probation are subject to conditions that substantially restrict their liberty, including; having to get permission to travel, move, or change jobs; unannounced visits to their homes; refraining from associating with certain people; and special conditions, like not using credit without permission from the probation officer); *see also Jones v. Cunningham*, 371 U.S. 236, 242 (1963) (same).

---

https://law.yale.edu/sites/default/files/area/center/liman/document/2015_liman_report-12-final-rev.pdf.

[3]Under the First Step Act, individuals may earn up to 54 days of credit off their sentence per year by participating in eligible BOP programming, as well as additional credit towards halfway house time. *See* Federal Bureau of Prisons, *An Overview of the First Step Act*, Available at: https://www.bop.gov/inmates/fsa/overview.jsp. Individuals cannot begin earning such credits until they actually enter BOP custody, however.

[4] *See* GAO Report 17-691, Nonviolent Drug Convictions, *Stakeholders Views on Potential Actions to Address Collateral Consequences,* (Sept. 2017).

August 19, 2025
Page 16

To put it simply, the nearly 20 months Mr. McDaniel has spent in custody for his offense and related conduct, coupled with the additional punishment he faces, is sufficient to meet the goal of retribution here.

*Deterrence*

The time Mr. McDaniel has already spent in custody is also sufficient to meet the goal of deterrence. Turning first to specific deterrence, Mr. McDaniel had never served a custodial sentence in any criminal case before his current offense in March 2022. The almost 20 months he has served for his conduct here is, therefore, a significant escalation that has imparted the seriousness of his actions to Mr. McDaniel and the importance of staying away from firearms altogether moving forward. *See United States v. Gohil*, 325 F. Supp. 936, 939 (E.D. Wis. 2018) ("Ordinarily, a lesser period of imprisonment will suffice to deter a defendant not previously subject to lengthy incarceration, as opposed to a defendant who has already served serious time yet continues to re-offend.").

As to general deterrence, a sentence of time served would reflect a sentence *above* the top of the guidelines given that Mr. McDaniel has already served 17 months in federal pretrial custody (and almost 20 months when accounting for his related state sentence). That is a significant sentence, and there is no reason to believe additional time is needed to accomplish further general deterrence. In fact, there is little empirical support for the idea that sentence length correlates to general deterrence much at all. *See* Kelli D. Tomlinson, *An Examination of Deterrence Theory: Where to Do We Stand?*, Fed. Probation, December 2016, at 34 (explaining that although "[s]everity of punishment was once thought to deliver the main deterrent effect; the more severe the consequence for law-breaking, the less likely and individual is to commit a crime," that assumption "has not been supported in the literature").

*Incapacitation*

It is worth reiterating that Mr. McDaniel's offense of conviction is aiding and abetting a straw purchase. It is in no way a violent offense, the purchase of the firearm was not coerced through threats or intimidation, and there is no indication Mr. McDaniel sought the firearm to carry out further criminal conduct. Nor does Mr. McDaniel have any history of firearm-related violence. Further, other conduct of concern raised in the PSR

August 19, 2025
Page 17

has already been addressed through his state revocation proceedings.[5] Those factors all suggest this is not a case that requires a lengthy sentence to further incapacitate Mr. McDaniel. Indeed, the time Mr. McDaniel has already spent in custody has fully served any need to protect the public. Since his offense back in March 2022, Mr. McDaniel has been in custody for a total of more than 2 years (including his initial 7-month confinement in state custody from October 18, 2022, until May 20, 2023; his confinement on his state revocation from November 11, 2023, until his release from state custody in March 20, 2024; and his confinement in federal pretrial custody from March 20, 2024, until the present). That is a significant period of incarceration for someone who had never served a custodial sentence before, and it was enough to accomplish any need for incapacitation.

*Rehabilitation*

Finally, this Court must also consider the need for the sentence imposed "to provide the defendant with the needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553. Mr. McDaniel certainly has rehabilitative needs – he has a history of substance abuse with both marijuana and alcohol. And those substances have certainly contributed to his criminality in the past.[6] Mr. McDaniel has never received any counseling or treatment for those needs, but such interventions are available in the community and can be ordered as a condition of his supervision. In fact, given significant cuts and staffing shortages at BOP

---

[5] The PSR notes the circumstances leading to Mr. McDaniel's state revocation in 2024, involving inappropriate messages and voice memos about his then girlfriend's minor daughter, K.B. Those messages are certainly troubling. But there is no indication they were anything beyond just messages. Further, Mr. McDaniel has faced punishment for that conduct through his state revocation – a sentence he has now completed. If the state thought additional punishment was warranted, it could have pursued further charges against Mr. McDaniel, but it did not. That conduct is not the subject of, nor is it related to, Mr. McDaniel's current offense, and it should not have an outsized impact on his sentence here. The appropriate way for the Court to factor in those allegations at Mr. McDaniel's sentencing is as part of his criminal history, which the guidelines calculation has already done – Mr. McDaniel's prior misdemeanor conviction from 2020 only counted for 2 criminal history points because of Mr. McDaniel's 2024 revocation. ECF No. 114 at ¶ 54.

[6] The PSR noted, for example, that Mr. McDaniel was reported "heavily drinking" when he sent the messages regarding K.B. ECF No. 114 at ¶ 54.

August 19, 2025
Page 18

that have affected the availability of programming,[7] those treatment needs would be *better* met in the community than in custody.

## CONCLUSION

This Court is tasked with imposing a sentence that is "sufficient but not greater than necessary" to serve the purposes of sentencing. For Mr. McDaniel, that standard has already been met. He has served 17 months in federal pretrial custody and nearly 20 months in total for his offense conduct when considering his related state sentence – longer than the top end of the correctly calculated guideline range. He also now stands convicted of his first felony, carrying with it the permanent collateral consequences of that status. Mr. McDaniel has already faced consequences that are significant, lasting, and meaningful.

For these reasons, Mr. McDaniel respectfully requests that this Court impose a sentence of time served, to be followed by a term of supervised release.

Sincerely,

*/s/ Dennise Moreno*

---

[7] *See* Walter Pavlo, *Challenges Facing The Next Director of Federal Bureau of Prisons*, Forbes (Feb. 04 2025), available at: https://www.forbes.com/sites/walterpavlo/2025/02/04/challenges-facing-the-next-director-of-federal-bureau-of-prisons/.